**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| **The Babylon Bee, LLC**, <br><br> *Plaintiff,* <br><br> v. <br><br> **Celia Foy Castillo**, in her official capacity as Chair of the State Ethics Commission; **Jeff Baker**, in his official capacity as member of the State Ethics Commission; **Stuart M. Bluestone**, in his official capacity as member of the State Ethics Commission; **Gary Clingman**, in his official capacity as member of the State Ethics Commission; **Kasandra A. Gandara**, in her official capacity as member of the State Ethics Commission; **Terry McMillan**, in his official capacity as member of the State Ethics Commission; and **Judy Villanueva**, in her official capacity as member of the State Ethics Commission, <br><br> *Defendants.* | **Case No.** 1:26-cv-02628 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. New Mexico has made it illegal to post AI-created satire of political candidates or issues without a state-mandated warning label.

2. The ban applies year-round; covers everything from flyers to tweets to memes; reaches those who post or repost; and triggers steep penalties, including fines up to $20,000.

3.     New Mexico's law empowers Defendants to do exactly what the First Amendment was ratified to prohibit: punish core political speech for no reason other than that they disapprove it.

4.     "From 1791 to the present," our Constitution "has permitted restrictions upon the content of speech in a few limited areas." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992). Outside these "historic and traditional categories," like obscenity, incitement, defamation, fighting words, and true threats, speech is protected by the First Amendment. *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (citation modified). Falsity is not one of these categories: without more, the government's declaration that speech is false does not empower it to restrict that speech.

5.     New Mexico's law purports to restrict "materially deceptive media," yet its definition sweeps in some of the most important forms of political speech—satire, parody, and political cartoon—long cherished in our constitutional tradition. These forms include content that is literally false, even as they employ exaggeration, overstatement, or inversion to communicate a true (and often vital) message.

6.     So, The Babylon Bee brings this action to stop New Mexico's political speech code and resurrect a fundamental right of every New Mexican: the right to freely poke fun at those running for office.

## JURISDICTION AND VENUE

7.      This action arises under the First and Fourteenth Amendments to the United States Constitution. This Court has subject-matter jurisdiction pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331 and 1343.

8.      This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57; injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

9.      Venue lies in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events that give rise to this lawsuit occurred in this District and because Defendants are residents of this District.

## PARTIES

### *Plaintiff*

10.      Plaintiff The Babylon Bee, LLC ("The Bee") is a Florida limited liability company with its principal place of business in Florida.

11.      The Bee publishes satirical news articles, photographs, and videos on its website (www.babylonbee.com), which averages more than 20 million viewers per month, including viewers in New Mexico.

12.      The Bee also publishes satirical articles, photographs, and videos on online platforms including X (formerly known as Twitter), Facebook, Instagram, Rumble, and YouTube.

13. The Bee has millions of followers and subscribers across these social media platforms, including followers and paid subscribers in New Mexico.

14. The Bee purchases advertising that promotes its merchandise and subscription product within New Mexico.

*Defendants*

15. Defendants are the members of the New Mexico State Ethics Commission (the "Commission"), which enforces New Mexico's laws regarding financial disclosure, lobbying, governmental conduct, and campaign reporting. *See* N.M. Stat. Ann. §§ 10-16G-5, 1-19-34.8. New Mexico's Campaign Reporting Act contains the provisions challenged in this lawsuit, codified at *id.* §§ 1-19-26(A), 1-19-26(S), 1-19-26.4(D), 1-19-26.4(E), 1-19-26.4(F), and 1-19-26.4(G).

16. The Commission consists of seven members, "appointed as follows: (1) one commissioner appointed by the speaker of the house of representatives; (2) one commissioner appointed by the minority floor leader of the house of representatives; (3) one commissioner appointed by the president pro tempore of the senate; (4) one commissioner appointed by the minority floor leader of the senate; (5) two commissioners appointed by the four legislatively appointed commissioners; and (6) one commissioner appointed by the governor, who shall be a retired judge and who shall chair the commission." *Id.* § 10-16G-3(A).

17. The Commission has authority to enforce the challenged provisions of the New Mexico Campaign Reporting Act in at least three ways: (1) investigating

4

complaints submitted by others, *see id.* § 10-16G-9(B); (2) initiating its own complaints and investigations, *see id.* § 10-16G-5(C)(1), and (3) filing lawsuits "if a violation has occurred or to prevent a violation of any provision of the Campaign Reporting Act." *Id*. § 1-19-34.6(C).

18.    When the Commission investigates complaints initiated by itself or filed by others, the Commission may petition a district court "for a subpoena for the attendance and examination of witnesses or for the production of books, records, documents or other evidence reasonably related to an investigation." *Id.* § 10-16G-10(J). "If a person neglects or refuses to comply with a subpoena, the commission may apply to a district court for an order enforcing the subpoena and compelling compliance." *Id.*

19.    After a hearing on any complaint, the Commission has authority to impose fines provided for by law, *Id.* § 10-16G-12(D), up to $1,000 per violation (not to exceed $20,000). *Id.* § 1-19-34.6(C).

20.    A quorum of the Commission consists of four commissioners, so long as there are at least two members of the state's largest political party and two members of the state's second-largest political party. *Id.* § 10-16G-3(H).

21.    With the exception of initiating a complaint, which requires five votes, the enforcement powers of the Commission may be exercised by a vote of four of the commissioners, so long as "at least four members, including at least two members of

the largest political party in the state and two members of the second largest political party in the state[] concur." *Id.*

22.    Defendant Castillo is the Chair of the Commission and has authority, in combination with the other Defendant commissioners, to investigate complaints, initiate complaints, seek enforcement of subpoenas, and initiate civil actions to enforce the Campaign Reporting Act, including the provisions challenged herein. She is sued in her official capacity.

23.    Defendants Baker, Bluestone, Clingman, Gandara, McMillan, and Villanueva are members of the Commission and have authority, in combination with the other Defendant commissioners, to investigate complaints, initiate complaints, seek enforcement of subpoenas, and initiate civil actions to enforce the Campaign Reporting Act, including the provisions challenged herein. All are sued in their official capacity.

## FACTS

### I.    Satire, parody, and political cartoons have a rich and important history, including in the United States.

24.    Satire is a distinct type of literature with a history that stretches back to Ancient Rome. Gilbert Highet, *Anatomy of Satire* 24 (1962).

25.    As a genre, satire focuses on topical content or individuals, speaks to particular moments, and generally "deals with actual cases, mentions real people by name or describes them unmistakably (and often unflatteringly)." *Id.* at 5, 13, 16.

6

26.    Parody is a form of satire that takes original content, imitates it, and then makes the original look absurd through various devices. *Id.* at 13.

27.    The end of satire is often to criticize or mock an idea, event, or person for the purpose of correction and improvement.

28.    Figures such as Plato (*Menexenus*), Miguel de Cervantes (*Don Quixote*), Voltaire (*Candide*), Jonathan Swift (*Gulliver's Travels*), and George Orwell (*Animal Farm*) have used satire to provide social commentary in order to expose underlying truths.

29.    Satirists "intend[] to shock" their audiences "[b]y compelling them to look at a sight they had missed or shunned" and help them to "realize the truth, and then move[] … to feelings of protest." *Id.* at 20. They "tell the truth with a smile, so that [they] will not repel [people] but cure them of th[eir] ignorance which is their worst fault." *Id.* at 235.

30.    In these ways, satire and parody make audiences do a double-take by convincing them that they are seeing a serious rendering of an original, and then allowing them to laugh at their own gullibility when they realize that they are really viewing satire or parody.

31.    Through this technique, satirists intend to prompt thought, internal reflection, and public dialogue about the subject of the satire.

32.     To do this effectively, satire and parody leverage the expectations that are created in audiences when they see something in a particular form and juxtapose that realism with the satirical form.

33.     This power comes from satire and parody's proximity to the real or original.

34.     As the Supreme Court recognized in another context, "[p]arody needs to mimic an original to make its point." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580–81 (1994).

35.     Political cartoons and memes perform a similar function, expressing real truths by presenting literal falsehoods.

36.     "Despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54 (1988).

37.     Political cartoons may achieve their point by exaggerating reality, using stylistic drawing or technological distortion to produce effects like "Lincoln's tall, gangling posture, Teddy Roosevelt's glasses and teeth, and Franklin D. Roosevelt's jutting jaw and cigarette holder [which] have been memorialized by political cartoons with an effect that could not have been obtained by the photographer or the portrait artist." *Id.* at 55.

8

38. These cartoons and memes communicate messages that literally true renderings cannot. "From the viewpoint of history it is clear that our political discourse would have been considerably poorer without them." *Id.*

39. From lampooning George Washington and Thomas Jefferson to Donald Trump and Kamala Harris, satire, parody, cartoon, and meme have been used to "tear[] down facades, deflate[] stuffed shirts, and unmask[] hypocrisy" with such consistency that "[n]othing is more thoroughly democratic than to have the high-and-mighty lampooned and spoofed." *Falwell v. Flynt*, 805 F.2d 484, 487 (4th Cir. 1986) (Wilkinson, J., dissenting from denial of rehearing).

## II. The Babylon Bee is a satirical news source that posts "Fake news you can trust."

40. The Bee falls squarely within this longstanding tradition of using satire and parody to speak the truth, expose bad ideas, and encourage societal and political change.

41. The Bee's tagline is "Fake news you can trust."

42. The Bee runs and controls a website that exposes foolishness, mocks absurdity, and highlights hypocrisy in faith, politics, and culture through satire, humor, and parody. *See* The Babylon Bee, https://babylonbee.com (last accessed July 28, 2026).

43. The Bee also offers a subscription option with two levels, Basic and Premium, that provide subscribers with additional content and other unique opportunities to engage with The Bee.

9

44.    Millions of people view The Bee's website each month, including between 8,400 and 10,400 active monthly users from New Mexico.

45.    The Bee runs online advertisements that promote its content and its subscription option to users throughout the United States, including New Mexico.

46.    The Bee has accounts on platforms like X, Facebook, Instagram, Rumble, and YouTube, where it republishes its articles, posts videos, and republishes third-party content.[1]

47.    The Bee currently has over five million followers on X, over two million followers on Instagram, over two million followers on Facebook, nearly half a million followers on Rumble, and nearly two million subscribers on YouTube.

48.    The Bee's articles generate millions of "impressions"—i.e., instances when a user sees its web page or platform post.

49.    The Bee's articles also consistently generate tens of thousands of "likes" and "reposts."

50.    As one example, The Bee posted an article entitled, *Trump Secures Unlimited Chips And Salsa In Mexican Trade Deal,* on X on February 3, 2025. The Babylon Bee (@TheBabylonBee), X, *Trump Secures Unlimited Chips And Salsa In Mexican Trade Deal* (Feb. 3, 2025), https://perma.cc/2E22-LEEF. The article satirizes the fact that, despite his reputation as a "dealmaker," President Trump often makes

---

[1] *See* The Babylon Bee, X, https://bit.ly/3N3apJ7; The Babylon Bee, Facebook, https://bit.ly/3XLkpfj; The Babylon Bee, YouTube, https://bit.ly/3XLztcy; The Babylon Bee, Instagram, https://bit.ly/3TLjPgq; The Babylon Bee, Rumble, https://perma.cc/YT9D-3G5V.

outlandish promises and demands, only to end up with something that was on the table all along.

51.    As of July 28, 2026, the post had accumulated over 1.2 million views, over 42,000 likes, and 4,300 reposts.

52.    The Bee posts six to eight articles on its website during the workweek and three to five articles during the weekends and then republishes those articles on X, Facebook, and Instagram.

53.    The Bee also publishes videos that it creates on YouTube and Rumble.

54.    The Bee posts about various topics, such as religion, politics, and current events, including these topics in relation to New Mexico.[2]

55.    The Bee regularly posts about politics, elections, and politicians, at both the national and state levels, including New Mexico.

56.    The Bee posts articles about New Mexico politicians and political issues related to New Mexico. Several examples of such articles and associated images are included in Exhibit A, and the posts are available here:

---

[2] *The Biggest Pros And Cons Of Living In Each State,* Babylon Bee (Aug. 12, 2023), https://perma.cc/M4RK-37TN; *New York Governor Hires Star Lawyer Saul Goodman To Sue If 'Roe V. Wade' Overturned,* Babylon Bee (Jul. 12, 2018), https://perma.cc/FE6N-YC6A; *Local Family Commutes 700 Miles To Attend Church That Meets Their Exact Specifications,* Babylon Bee (Oct. 9, 2017), https://perma.cc/T4J8-5WW5.

a. *New Mexico Governor Suspends First Amendment To Silence Criticism Over Suspending Second Amendment*, Babylon Bee (Sept. 13, 2023), https://perma.cc/A3XY-VUVV.



b. *New Mexico Criminals Excited To Hear No One Will Be Armed For Entire Month*, Babylon Bee (Sept. 9, 2023), https://perma.cc/7697-LYTV.



14

c. *Dems Accidentally Reveal Their Plan To Destroy The Constitution Ahead of Schedule*, Babylon Bee (Sept. 10, 2023), https://perma.cc/B55Y-95R8.



d. *10 More Things Trump Plans To Rename*, Babylon Bee (Jan. 8, 2025), https://perma.cc/UE6Q-H5MH.



57. The Bee digitally combined the images contained in paragraph 56.b, which depicts a criminal celebrating an executive action taken by Governor Michele Grisham of New Mexico. Neither action actually occurred.

58. The Bee also uses artificial intelligence (AI) to generate images in its content.

15

59.    The Bee does not and will not seek the consent of the individuals depicted in its content before publishing its content.

60.    The Bee intends to continue to create and post content on its own website, X, Facebook, Instagram, YouTube, and Rumble, and content materially similar to the content referenced in paragraph 56. The Bee will post satire and parody that uses AI images and that concern candidates for office in New Mexico or questions that appear on the ballot in New Mexico elections.

61.    As with satire and parody more generally, The Bee intends to and desires to have these posts expose bad ideas, cause viewers to reflect on the consequences of those ideas, and prompt viewers to take appropriate action, including through voting, to remedy the consequences of those ideas.

62.    The Bee created the content identified in paragraph 56. The Bee creates and will continue to create materially similar content accompanied by images generated by artificial intelligence, knowing that the material and images will depict individuals engaged in conduct or speech in which the depicted individuals did not actually engage.

63.    Indeed, the purpose of The Bee's satire and parody—like other satire and parody—is to create content that is not literally true in every (or any) respect, so The Bee knows that at least some of its content is literally false and depicts individuals engaged in conduct or speech in which the depicted individual did not

engage. The Bee publishes, and will continue to publish, such content anyway to prove a broader point.

64.    The Bee has recently posted a video depicting a satirical travel advertisement for the State of New Mexico. *Visit New Mexico: A Democrat Untopia,* Babylon Bee (Aug. 4, 2026), https://bit.ly/4wbjgg9 (last accessed Aug. 5, 2026). A true and exact copy of the video The Bee posted is attached to this Complaint as Exhibit B.

65.    The Bee's satirical travel advertisement invites viewers to "dream what it would be like not having the Bill of Rights," and assures them, "Our governor and supreme court have you covered." *See* Ex. B at 0:00:38–0:00:44. During this time, the video displays a real image of New Mexico Supreme Court Justice David K. Thomson, who will appear on the ballot in New Mexico's November 2026 election.

66.    Following the real image of Justice Thomson, the satirical travel advertisement includes an AI-generated video of Justice Thomson making a public statement on a news broadcast, in which he says, "The New Mexico Supreme Court hereby rules against the Second Amendment, the First Amendment, or any other



amendment that lets people do things." Ex. B at 0:00:44–0:00:55. A screenshot of the AI-generated video of Justice Thomson is below:

67.     The Bee's video thus follows the traditional path for satire and parody by mimicking the original or taking acts or statements to their logical conclusion for maximum effect, including the New Mexico Supreme Court's track record of ruling against constitutional rights in ways that would ultimately be contradicted by the U.S. Supreme Court.[3]

68.     The Bee intends to create content using AI that parodies or satirizes other candidates or ballot questions in New Mexico elections.

69.     Satire and parody, by their nature, require swift reaction to current events: they depend on reference to those events while they are still fresh in the mind of the public.

70.     Thus, The Bee cannot predict, as New Mexico's November election approaches, which other candidates or ballot questions may present opportunities for effective satire or parody. But HB 182 threatens The Bee with punishment for responding to any such opportunities by using AI to create satirical or parodical material.

71.     The Bee has experienced censorship by various platforms because of the content of its posts.

---

[3] *Compare Elane Photography, LLC v. Willock*, 309 P. 3d 53, 65–68 (N.M. 2013) *with 303 Creative LLC v. Elenis*, 600 U.S. 570, 588–89 (2023).

72.    For example, during Justice Barrett's confirmation hearing, Facebook determined that The Bee "incit[ed] violence" by posting a Monty Python-inspired satire piece entitled, "Senator Hirono Demands ACB Be Weighed Against a Duck to See If She Is a Witch."[4] When challenged, Facebook initially refused to change its determination.[5] Facebook later reversed course to allow the article.

73.    Instagram determined that The Bee's CEO violated Instagram's community guidelines against "hateful false information" and "hate speech or symbols" for sharing a *Slate* article entitled, "It's About Time for Us to Stop Wearing Masks Outside," along with the comment, "Sane people never did this."[6]

74.    YouTube flagged The Bee as a "violent criminal organization[ ]" and removed its video titled, "If the LEAKED Nashville Shooter Manifesto is legit, what does it say about censorship in the US?"[7] Even after The Bee appealed the mischaracterization of the content, YouTube held to its determination that the video violated its violent criminal organization policy.[8]

---

[4] *Senator Hirono Demands ACB Be Weighed Against A Duck to See If She Is A Witch,* Babylon Bee (Oct. 14, 2020), https://perma.cc/QYG3-9W6P.

[5] *See AGAIN! Facebook censors and penalizes The Babylon Bee for the most ridiculous article ever*, Not the Bee (Oct. 20, 2020), https://perma.cc/7FG5-GENV.

[6] *See Babylon Bee CEO posted this to Instagram and now they're threatening to ban him for "harmful false information" and "hate speech." WHAT?*, Not the Bee (Apr. 18, 2021), https://perma.cc/4WUV-5AYY.

[7] Seth Dillon (@SethDillon), X (Nov. 8, 2023, 8:44 AM), https://perma.cc/ZCJ6-4WJ7.

[8] Seth Dillon (@SethDillon), X (Nov. 8, 2023, 10:48 AM), https://perma.cc/FMF9-R8MY.

75.    Twitter also locked The Bee's account for "hateful conduct" under its content moderation policies after it named former U.S. Assistant Secretary for Health Dr. Rachel Levine the site's "Man of the Year."[9]

76.    Twitter refused to unlock The Bee unless it agreed to delete the tweet.

77.    Because The Bee refused to do so on principle, Twitter did not unlock The Bee's account.

78.    The action taken against The Bee's Twitter account served as a notable example of the censorship that motivated Elon Musk to acquire the platform.

79.    Had Twitter not been sold to Musk, The Bee would have remained locked out of the platform unless and until it censored itself by deleting the violating tweet.[10]

80.    After Musk purchased Twitter (now X), The Bee's account was reinstated almost immediately.

**III.    HB 182 punishes political speech.**

81.    HB 182 was passed by the New Mexico legislature on February 14, 2024. It was signed by the governor on March 5, 2024, and went into effect on May 15, 2024. The bill's provisions are codified in the New Mexico Campaign Reporting Act, N.M. Stat. Ann. § 1-19-26.

---

[9] Seth Dillon (@SethDillon), X (Mar. 20, 2022, 5:42 PM), https://perma.cc/7M3L-XJGZ.

[10] Gabriel Hays, *The Babylon Bee's Twitter account reinstated by Elon Musk after suspension for transgender joke: 'We're back,'* Fox News (Nov. 18, 2022), https://perma.cc/TU3A-8NGD.

82.    This lawsuit challenges the following provisions, which are collectively referred to as the "Challenged Provisions":

- *Id.* § 1-19-26(A), defining the term "advertisement," because the definition discriminates based on content and speaker;

- *Id.* § 1-19-26(S), defining the term "materially deceptive media," because the definition discriminates based on content and is unconstitutionally vague;

- *Id.* § 1-19-26.4(D), requiring any person who "creates, produces or purchases an advertisement that contains materially deceptive media" to "include a disclaimer," because this provision is unconstitutionally overbroad and it unconstitutionally restricts and compels speech;

- *Id.* § 1-19-26.4(E), defining what the "disclaimer" must include, because this provision is unconstitutionally vague and restricts and compels speech; and

- *Id.* § 1-19-26.4(F), which makes "[e]ach occurrence of a person creating, producing or purchasing an advertisement subject to the disclaimer requirements as provided in Subsection D of this section that fails to meet the disclaimer requirements … a separate violation," because this provision is unconstitutionally overbroad and because it unconstitutionally restricts and compels speech.

21

- *Id.* § 1-19-26.4(G), which discriminates based on speaker by permitting "a radio or television broadcasting station, including a cable television, satellite television or streaming service operator" to publish a prohibited advertisement "as part of a bona fide newscast" subject to less stringent disclaimer requirements.

83. HB 182 makes it a civil offense each time a non-exempted person "produces or purchases an advertisement that contains materially deceptive media" that does not include a state-scripted disclaimer. *Id.* § 1-19-26.4(D).

84. An "advertisement" is *any* "communication referring to a candidate or ballot question that is published, disseminated, distributed or displayed to the public by print, broadcast, satellite, cable or electronic media," and thus includes any of The Bee's electronic communications referring to New Mexico candidates or ballot questions. *Id.* § 1-19-26(A).

85. New Mexico's definition of "advertisement" turns on the political content of speech, since it only applies to speech "referring to a candidate or ballot question." *Id.* The definition of "advertisement" is not tied to whether the speech proposes a commercial transaction.

86. New Mexico's definition further discriminates based on content by totally exempting any "communication appearing in a news story or editorial distributed through a print, broadcast, satellite, cable or electronic medium." *Id.* § 1-19-26(A)(2). A "news story or editorial" is exempt, while entertainment, satire,

22

parody, cartoons, memes, and anything else not constituting "a news story or editorial" is restricted.

87. The same provision discriminates based on speaker identity, as it exempts news media sources from its definition of "advertisement" (since such sources are the ones that will publish "a news story or editorial distributed through a print, broadcast, satellite, cable or electronic medium"), but does not exempt satirical sources like The Bee (which publishes "Fake news you can trust") or other non-news electronic sources (like political cartoon or meme pages).

88. HB 182 defines "materially deceptive media" as "an image, video or audio that: (1) depicts an individual engaged in conduct or speech in which the depicted individual did not engage; (2) was published, disseminated, distributed or displayed to the public without the consent of the depicted individual; and (3) was produced in whole or in part by using artificial intelligence." *Id.* § 1-19-26(S).

89. HB 182 does not specify what "published, disseminated, distributed or displayed to the public" means. For example, it does not say whether sending content to members of the public through means such as text messaging, email, direct messaging, or reposting falls within the meaning of the definition. Thus, HB 182 does not notify The Bee what means of transmitting its content, including content offered to limited classes of the public, like The Bee's paid subscribers, are subject to the law's disclaimer requirements.

90.    The definition also fails to specify *whose* activity falls within its scope. The use of the passive voice in "was published, disseminated, distributed or displayed to the public without the consent of the depicted individual" suggests that distribution by a third party to the public through text messaging, email, direct messaging, or reposting could cause content to fall within the definition.

91.    HB 182 does not specify what "in whole or in part by using artificial intelligence" means. For example, it does not say whether the artificial intelligence must have been used to create the portion of the content that "depicts an individual engaged in conduct or speech in which the depicted individual did not engage," or whether use of AI for another purpose (like creating a border or editing accompanying text) falls within the definition.

92.    The Bee's satire and parody depict individuals engaged in conduct or speech in which the depicted individual did not engage, and The Bee intends to continue producing, publishing, disseminating, and distributing satire and parody depicting conduct or speech in which the depicted individual did not engage, or commenting on ballot questions that including depictions of conduct or speech in which the depicted individual did not engage.

93.    The Bee's satire and parody content does not propose a commercial transaction and does not otherwise qualify as an advertisement within the regular definition of that term.

94. The Bee does not seek or secure consent of the subjects of its satire and parody before publishing, distributing, or displaying its satire and parody. The Bee intends to continue publishing, distributing, or displaying its satire and parody without the consent of the subjects of those works.

95. The images and video in The Bee's satire and parody are produced in whole or in part using artificial intelligence. The Bee intends to continue publishing, distributing, and displaying images and video created in whole or in part using artificial intelligence, along with its works of satire and parody.

96. HB 182 penalizes *all* distribution of materially deceptive information unless it is accompanied by the state-scripted disclaimer. HB 182 has no intent threshold—the state is not required even to show negligence. HB 182 has no harm or damages threshold—the state need not show a likelihood or even a possibility of any harm to anyone.

97. HB 182's disclaimer requirements are onerous. HB 182 requires every covered communication "that contains materially deceptive media" to "include a disclaimer." *Id.* § 1-19-26.4(D).

98. "The disclaimer shall appear in a clear and conspicuous manner in every language used in the advertisement ...." *Id.*

99. The disclaimer must state: "'This ____ has been manipulated or generated by artificial intelligence' The blank line in the disclaimer shall be filled

25

with each of the following terms that describes the media: (1) image; (2) video; or (3) audio." *Id.*

100.    If the covered material is an image, "the text of the disclaimer shall appear in a size that is easily readable," in addition to being replicated in every language the original material includes. *Id.* § 1-19-26.4(E)(1).

101.    If the covered material is a video, "the disclaimer shall appear for the duration of the video in a size that is easily readable." *Id.* § 1-19-26.4(E)(2).

102.    If the covered material is audio, "the disclaimer shall be read in a clearly spoken manner and in a pitch that can be easily heard at the beginning of the audio, at the end of the audio and, if the audio is greater than two minutes in length, interspersed within the audio at intervals of not greater than two minutes each." *Id.* § 1-19-26.4(E)(3).

103.    HB 182 does not exempt satire and parody.

104.    HB 182 specifies that an advertisement containing satire or parody is subject to the law's disclaimer requirements. *See id.* § 1-19-26.4(G)(3) ("an advertisement that reasonably constitutes satire or parody" is only lawful "if the advertisement includes a disclaimer consistent with the requirements provided in Subsection D of this section").

105.    The purported exemption for satire or parody is no exemption at all because, in order to comply with "the requirements provided in Subsection D of this section," the material must meet the same disclaimer requirements that apply to all

other forms of media. Subsection D is what requires *all* advertisements "that contain[] materially deceptive media" to "include a disclaimer" in the first place. *Id.* § 1-19-26.4(D).

106.    HB 182 expressly requires satire and parody to follow all of the law's disclaimer requirements while providing looser standards to "a radio or television broadcasting station, including a cable television, satellite television or streaming service operator." Those entities may display advertisements containing materially deceptive information so long as the display is "as part of a bona fide newscast, news interview, news documentary or on-the-spot coverage of a bona fide news event" and "the broadcast clearly acknowledges through content or a disclaimer, in a manner that can be easily read or heard, that the advertisement was generated in whole or in part by using artificial intelligence and does not accurately represent the speech or conduct of the depicted individual." *Id.* § 1-19-26.4(G)(1).

107.    And, since any "communication appearing in a news story or editorial distributed through a print, broadcast, satellite, cable or electronic medium" is excluded from the definition of "advertisement" entirely, *those* communications can include "materially deceptive media" with *no* disclaimer whatsoever. *Id.* § 1-19-26(A)(2). If nestled within a "news story," a speaker can publish as much "materially deceptive media" as it wishes with no disclaimer. But The Bee's protected political satire and parody is illegal without a disclaimer.

108. All forced, government-scripted disclaimers on political speech unlawfully burden protected speech. But New Mexico imposes a lesser burden on favored speakers by allowing them to provide at most a single disclaimer, while all other speakers, including The Bee, must display a disclaimer throughout their entire display of the image or video. *See id.* § 1-19-26.4(E)(2).

109. "Each occurrence of a person creating, producing or purchasing an advertisement subject to the disclaimer requirements as provided in Subsection D of this section that fails to meet the disclaimer requirements constitutes a separate violation" and subjects the person "to civil penalties as provided in Section 1-19-34.6." *Id.* § 1-19-26.4(F).

110. The provision described in paragraph 109 restricts speech at all times, 365 days per year, even in non-election years.

111. Section 1-19-34.6(C) authorizes the Defendant State Ethics Commission to "institute a civil action in district court" to seek relief, which "may include a permanent or temporary injunction, a restraining order or any other appropriate order, including an order for a civil penalty of up to one thousand dollars ($1,000) for each violation not to exceed a total of twenty thousand dollars ($20,000)."

## IV.  Defendants are on notice that HB 182 is facially unconstitutional.

112. The Defendant members of the State Ethics Commission are active participants in New Mexico's legislative process.

113.   As the enforcing authority for New Mexico's ethics laws, including the Challenged Provisions of the Campaign Reporting Act, Defendants regularly issue an outline of legislative priorities containing Defendants' recommendations for changes to the laws they enforce.

114.   Prior to HB 182's enactment, lawmakers were notified of the constitutional infirmities in HB 182.

115.   The Public Regulation Commission provided an Agency Bill Analysis of HB 812. A true and accurate copy of the Public Regulation Commission's Agency Bill Analysis is attached to this Complaint as Exhibit C. Under "Significant Issues" the Public Regulation Commission reported that "The enforcement of certain provisions of this bill may be subject to challenge on First Amendment grounds and impeding the exercise of free speech." Ex. C at 2.

116.   The Corrections Department provided an Agency Bill Analysis of HB 182. A true and accurate copy of the Corrections Department's Agency Bill Analysis is attached to this Complaint as Exhibit D. The Agency Bill Analysis provided to the legislature by the Corrections Department reported that HB 182 "relates to political speech, and implicates the First Amendment to the US Constitution." Ex. D at 3.

117.   Upon signing HB 182, Governor Grisham issued a signing statement. A true and accurate copy of Governor Grisham's signing statement is attached to this Complaint as Exhibit E.

29

118.    Governor Grisham acknowledged that the Defendant members of the State Ethics Commission "expressed concerns to my Office about this legislation's enforceability following its passage since the Legislative Finance Committee failed to request the Commission's input during the session." Ex. E at 1.

119.    Governor Grisham continued, "I, too, am concerned that portions of this legislation are ambiguous and may pose legal issues. To that end, I will be requesting an official opinion from the Attorney General to address these issues." *Id.*

120.    On information and belief, Defendants are aware of the bill analyses detailed in paragraphs 115–116.

121.    Despite statements of concern about HB 182's constitutionality from two agencies, the Defendant members of the State Ethics Commission, and the governor in 2024, Defendants' 2025 outline of legislative priorities addressed none of the unconstitutional provisions HB 182 added to the Campaign Reporting Act. A true and accurate copy of Defendants' Press Release outlining their 2025 legislative priorities is attached to this Complaint as Exhibit F.

122.    In March 2024, Governor Grisham submitted a request to Attorney General Torrez for an advisory opinion on HB 182.

123.    Attorney General Torrez issued an advisory opinion on HB 182 on July 3, 2025. A true and accurate copy of the advisory opinion is attached to this Complaint as Exhibit G.

124.    Attorney General Torrez agreed that HB 182 does not exempt satire and parody. Rather, as described in paragraphs 104–107, HB 182 requires satire and parody to include "the disclaimer that is required of all other advertisements with materially deceptive media." Ex. G at 6. "Read literally," he continued, "Subsection G(3) merely repeats Subsection D for a specific type of advertisement." *Id.*

125.    Since there is no exemption for satire and parody under HB 182, Attorney General Torrez concluded that HB 182's prohibition on satire and parody that does not include a disclaimer is unconstitutional because it is "not substantially related to the governmental interests it is designed to protect and is not narrowly tailored for this purpose." *Id.* at 6.

126.    Attorney General Torrez relied on *Kohls v. Bonta*, 752 F. Supp. 3d 1187, 1196–97 (E.D. Cal. 2024), an opinion granting a preliminary injunction against a similar law in California. *See also Kohls v. Bonta*, 797 F. Supp. 3d 1177, 1192 (E.D. Cal. 2025) (entering final judgment against California's law).

127.    Attorney General Torrez ultimately concluded, "Given the importance of satire and parody to the marketplace of ideas, this part of the statute is likely unconstitutional on its face." Ex. G at 6.

128.    Attorney General Torrez's opinion is not binding on the Defendant members of the State Ethics Commission.

129.    Defendants have not disavowed their intent to enforce the unconstitutional provisions HB 182 added to the Campaign Reporting Act.

31

**V.    HB 182 imposes prohibitive burdens on The Bee, both restricting and compelling its speech.**

130.    HB 182 has imposed and continues to impose significant restrictions, pressures, and burdens on The Bee's expression.

131.    The only way for The Bee to lawfully publish the content it intends to publish is to amend its speech by labeling the content as having "been manipulated or generated by artificial intelligence" in a size, language, and duration that complies with HB 182.

132.    This disclaimer alters the content of the message The Bee desires to express by forcing it to incorporate New Mexico's desired message into its content.

133.    This disclaimer alters the content of the satire and parody The Bee wants to express by alerting the viewer to the satirical or parodical nature of the communication and thereby depriving the expression of its rhetorical force. Put simply, HB 182 spoils the joke as it begins, each and every time.

134.    The Bee is not willing to post content with this label because it does not want this disclaimer to alter its message.

135.    HB 182 prohibits The Bee from publishing the content it wishes to publish.

136.    HB 182 also does not provide The Bee with sufficient notice to determine what disclaimer size *would* comply, even if The Bee sought to comply. HB 182 requires "the text of the disclaimer shall appear in a size that is easily readable." What is "easily readable" varies dramatically by reader.

137.    In addition, HB 182 provides unbridled discretion to the Defendant enforcement authorities, since there are no objective standards that guide their determination of whether a disclaimer is "easily readable."

138.    HB 182 requires The Bee to alter the content of the video identified in paragraphs 64–67 above by stamping the following disclaimer on its content: "This [image] has been manipulated or generated by artificial intelligence." N.M. Stat. Ann. § 1-19-26.4(D).

139.    Compliance with this provision would dramatically alter the content and message of the video, as this example shows:



140.    HB 182 harms The Bee by threatening it, its website, and its online platform accounts for posting content that New Mexico defines as "materially deceptive."

141. X, Facebook, Instagram, YouTube, and Rumble have terms of service that require compliance with applicable law, including HB 182.

142. By failing to comply with applicable law, The Bee risks being deplatformed.

143. If The Bee posts content that violates HB 182, it risks disciplinary action or other sanctions from X, Facebook, Instagram, YouTube, or Rumble, which may include temporary bans or removal of these accounts. Most of these platforms have already shown they are ready, willing, and able to sanction The Bee.

144. Any user of X, Facebook, Instagram, YouTube, or Rumble that dislikes The Bee's content can report that content on those platforms, increasing the likelihood that The Bee will be deplatformed for content that violates any state law, including HB 182.

145. The Bee's substantial risk of being deplatformed or otherwise punished by these online platforms for posting its desired content causes it material harm because of content that it has posted in the past, as identified in paragraphs 56 and 64–67 above.

146. The Bee's revenue, access to followers and subscribers, and access to a platform of its choice are materially harmed by HB 182.

147. The Bee faces a substantial risk that the enforcement of HB 182 will cause online platforms to remove The Bee or cause these platforms to remove The Bee's content if it is materially similar to the posts in paragraphs 56 and 64–67 above.

148.    Such removal would impair The Bee's revenue and reputation, cause it to lose access to one or more large platforms to proclaim its messages, and cause it to lose access to the millions of followers and subscribers it has attracted across X, Facebook, Instagram, YouTube, and Rumble.

149.    The Bee's freedom to engage in its desired expression is burdened by HB 182.

150.    The Bee's freedom to refrain from speaking the State of New Mexico's mandated message is burdened by HB 182.

151.    The burdens placed on The Bee and countless other speakers by HB 182 are unnecessary to achieve any legitimate interest of New Mexico's. State officials, including Defendant members of the State Ethics Commission, have not  explored alternatives like counterspeech or educational campaigns to help New Mexico's electorate detect AI-generated media.

152.    Private platforms already undertake measures that could make state counterspeech even more effective. For example, X has a "Community Notes" program that permits users to flag false content and to provide needed context or correction. X also temporarily suspends revenue sharing when users share false, AI-generated footage of military conflict.

153.    Facebook and Instagram are in the process of rolling out their own "Community Notes" program.

154. New Mexico and the Defendant members of the State Ethics Commission could adopt non-coercive measures to identify and counter false speech about candidates or ballot questions. Instead, they have chosen to censor the core political speech of The Bee and countless others, causing ongoing, irreparable injury.

## ALLEGATIONS OF LAW

155. The Bee distributes and intends to continue distributing content that is prohibited by HB 182.

156. HB 182 violates The Bee's constitutional rights and chills and deters it from exercising its constitutional rights.

157. As a direct and proximate result of Defendants' violations of The Bee's constitutional rights, The Bee has suffered and will suffer ongoing irreparable harm, entitling The Bee to declaratory and injunctive relief.

158. The Bee does not have an adequate monetary or legal remedy for the deprivation of its constitutional rights.

159. Unless Defendants are enjoined, The Bee will continue to suffer irreparable harm.

160. In enforcing HB 182, Defendants, their agents, and persons under their control act under the color and pretense of the law, statutes, regulations, customs, usages, or policies of the State of New Mexico.

161. To the extent the state claims an interest in combating election-related falsehoods, the state can further this interest through counterspeech and programming to help the electorate detect AI-generated content.

162. Counterspeech or programming to help the electorate detect AI-generated content are effective, less-restrictive alternatives on their own. These alternatives are made even more effective in conjunction with the ongoing efforts by private platforms to label AI-generated content and to produce financial disincentives for posting misleading AI-generated content.

## FIRST CAUSE OF ACTION
## VIOLATION OF THE FIRST AMENDMENT'S FREE SPEECH AND FREE PRESS CLAUSES BY HB 182
## 42 U.S.C. § 1983

163. The Bee repeats and realleges each allegation contained in paragraphs 1–162 above.

164. The First Amendment's Free Speech and Free Press Clauses protect The Bee's ability to create, publish, and distribute its speech. The Fourteenth Amendment incorporates the First Amendment against the State of New Mexico.

165. The First Amendment also protects The Bee's right to be free from content, viewpoint, and speaker-based discrimination, overbroad restrictions on speech, and vague laws allowing unbridled discretion by enforcement officials.

166. The Bee engages in activities protected by the First Amendment when it creates, publishes, or distributes its own speech or republishes the speech of others or receives others' constitutionally protected speech.

37

167.    The Challenged Provisions of HB 182 constitute an impermissible and unreasonable restriction of protected speech because they burden substantially more speech than is necessary to further any compelling government interest.

168.    As applied and on their face, the Challenged Provisions of HB 182 bar and chill speech based on content and speaker.

169.    As applied and on their face, the Challenged Provisions of HB 182 are not content-neutral because they target only "materially deceptive media," and only a certain subset of that kind of speech. Specifically, they target speech that "depicts an individual engaged in conduct or speech in which the depicted individual did not engage" when "referring to a candidate or ballot question."

170.    As applied and on their face, the Challenged Provisions of HB 182 are not speaker-neutral because they exempt "a communication appearing in a news story or editorial distributed through a print, broadcast, satellite, cable or electronic medium."

171.    The Challenged Provisions' exemption for "a communication appearing in a news story or editorial distributed through a print, broadcast, satellite, cable or electronic medium" also render them wildly under-inclusive, by permitting "materially deceptive media" to be displayed with no disclaimer in thousands of communications per election season.

172.    As applied and on their face, the Challenged Provisions of HB 182 are not speaker-neutral because they impose less-stringent disclaimer requirements on

"a radio or television broadcasting station, including a cable television, satellite television or streaming service operator, programmer or producer, that broadcasts an advertisement as part of a bona fide newscast, news interview, news documentary or on-the-spot coverage of a bona fide news event."

173. The Challenged Provisions of HB 182 are facially unconstitutional because in every application, they raise the same First Amendment problems, as detailed above.

174. The Challenged Provisions of HB 182 are unconstitutional as applied to The Bee because they are content-, viewpoint-, and speaker-based regulations that ban, chill, and burden The Bee's desired speech.

175. As applied to The Bee, the Challenged Provisions of HB 182 compel speech it objects to, interfere with The Bee's editorial judgment, and compel it to publish and disseminate speech it objects to.

176. The unconstitutional applications of the Challenged Provisions of HB 182 are substantial in comparison to any constitutional ones. Therefore, as acknowledged by Attorney General Torrez, HB 182 is substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

177. The Challenged Provisions of HB 182 are substantially overbroad because they subject constitutionally protected satire and parody to the same disclosure requirements as other dissemination of "materially deceptive media," even though satire and parody are not likely to mislead a reasonable viewer or listener.

39

178. The number of unconstitutional applications of the Challenged Provisions of HB 182 is substantial in relation to the number of constitutional applications. HB 182 itself has almost no constitutional applications, since materially deceptive media that falls into a category of unprotected speech can be regulated through the state's existing libel, defamation, and fraud laws. HB 182's impact lands almost entirely on constitutionally protected speech.

179. HB 182's civil prohibition applies to speech at all times, including in non-election years. In so doing, HB 182's unconstitutional applications are also substantial in relation to any constitutional applications.

180. HB 182's definition of "materially deceptive media" is not limited by medium and does not explain what it means by "displayed to the public," subjecting The Bee to liability when its content is shared by others through text, email, direct messaging, or reposting on social media platforms. This imposes liability on The Bee and on others who would otherwise wish to share and hear The Bee's content, deterring them from speaking and receiving wanted speech.

181. HB 182's definition of "materially deceptive media" prohibits the use of artificial intelligence in ways that do not advance the state's interest while leaving unregulated activity that may otherwise threaten the state's interest. By prohibiting content "produced in whole or in part by using artificial intelligence" without requiring any nexus between the use of artificial intelligence and the "conduct or speech in which the depicted individual did not engage," the law also prohibits benign

or unrelated use of artificial intelligence in any part of the work. And, by prohibiting *only* content "produced in whole or in part by using artificial intelligence," the law leaves unregulated other speech that "depicts an individual engaged in conduct or speech in which the depicted individual did not engage," including photorealistic, computer-generated content that uses methods other than artificial intelligence.

182. The Challenged Provisions of HB 182 vest unfettered discretion in state officials to punish speech in accordance with their own subjective ends for election regulations.

183. The Challenged Provisions of HB 182 impose a substantial risk of harm on The Bee because it intends to post content that violates or at least arguably violates HB 182.

184. Defendants' enforcement of HB 182 does not serve any compelling, or even valid, government interest.

185. The Challenged Provisions of HB 182 are not a narrowly tailored means of achieving any compelling, or even valid, governmental interest.

186. Multiple, less restrictive means of combating materially deceptive media remain available to Defendants, including counterspeech and educational resources or campaigns.

187. Accordingly, facially and as applied to The Bee, the Challenged Provisions of HB 182 violate the First Amendment's protections for free speech and free press.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE FOURTEENTH AMENDMENT BY HB 182
## 42 U.S.C. § 1983

188. The Bee repeats and realleges each allegation contained in paragraphs 1–162 above.

189. The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice of whether their desired speech violates the law.

190. Due process requires that people of ordinary intelligence be able to understand what conduct a given statute or regulation prohibits.

191. Statutes or regulations that fail to provide this fair notice and clear guidance are void for vagueness.

192. Statutes, rules, or regulations that authorize or even encourage arbitrary or viewpoint-discriminatory enforcement are void for vagueness.

193. The Bee, Defendants, and third parties of ordinary intelligence cannot know what content is prohibited by the Challenged Provisions of HB 182.

194. The Challenged Provisions of HB 182 chill and restrain satirists, political humorists, and other original content creators, subjecting them to censorship and other punitive sanctions for their speech.

195. The Challenged Provisions of HB 182 chill and restrain the speech of those wishing to republish certain content prohibited by those provisions by subjecting the dissemination of that content to censorship.

196.    The Challenged Provisions of HB 182 do not provide fair notice of what they prohibit.

197.    The Challenged Provisions of HB 182 do not provide fair notice of what they exempt, particularly because N.M. Stat. Ann. § 1-19-26(A) defines neither "news story" nor "editorial."

198.    The Challenged Provisions of HB 182 authorize and encourage discriminatory enforcement by Defendant members of the State Ethics Commission. They can, for example, decide that favored speech qualifies as a "news story" or "editorial" and, therefore, does not even qualify as an "advertisement" under N.M. Stat. Ann. § 1-19-26(A), while construing those undefined terms narrowly when enforcing the law against disfavored speech.

199.    The Challenged Provisions of HB 182, especially N.M. Stat. Ann. § 1-19-26(S) and *Id.* § 1-19-26.4(D), use unconstitutionally vague phrases, including "produced in whole or in part by using artificial intelligence," "a size that is easily readable," and "pitch that can be easily heard," when describing its disclaimer requirements.

200.    Defendants can use this vagueness, and the unbridled discretion it provides, to apply the Challenged Provisions of HB 182 in a way that discriminates against the content, viewpoints, and actions Defendants disfavor, since they can decide on a case-by-case (including a content or viewpoint basis) whether to proceed against any media Defendants disfavor.

201. Accordingly, facially and as applied to The Bee, the Challenged Provisions of HB 182 violate the Fourteenth Amendment's Due Process Clause and chill protected speech.

## PRAYER FOR RELIEF

Plaintiff respectfully asks this Court to enter judgment against Defendants and provide the following relief:

A.    A declaration that the Challenged Provisions of HB 182 are facially unconstitutional and are unconstitutional as applied to Plaintiff because they have violated and continue to violate the First and Fourteenth Amendments of the United States Constitution.

B.    A preliminary and permanent injunction to stop Defendants and any person acting in concert with them or under their authority from:

1.    Enforcing the Challenged Provisions of HB 182 as applied to Plaintiff's constitutionally protected speech and press; and

2.    Enforcing the Challenged Provisions facially.

C.    An award of Plaintiff's costs and expenses in this action, including reasonable attorneys' fees under 42 U.S.C. § 1988;

D.    Any other relief that the Court deems equitable and just in the circumstances.

Respectfully submitted this 11th day of August, 2026.


                                    /s/ Jonathan Scruggs

Melanie J. Rhodes                   Jonathan Scruggs
NM Bar No. 24-488                   AZ Bar No. 030505
AND JUSTICE LAW                     ALLIANCE DEFENDING FREEDOM
5600 Eubank Blvd., NE               15100 N 90th Street
Suite 195                           Scottsdale, AZ 85260
Albuquerque, New Mexico 87111       T: (480) 444-0020
T: (505) 350-7674                   F: (480) 444-0028
melanier@andjusticelaw.com          jscruggs@adflegal.org

                                    Philip A. Sechler*
                                    DC Bar No. 426358
                                    P. Logan Spena*
                                    VA Bar No. 98407
                                    Christine N. Marsden*
                                    VA Bar No. 100159
                                    ALLIANCE DEFENDING FREEDOM
                                    44180 Riverside Pkwy
                                    Lansdowne, Virginia 20176
                                    T: (571) 707-4655
                                    F: (571) 707-4656
                                    psechler@ADFlegal.org
                                    lspena@ADFlegal.org
                                    cmarsden@adflegal.org

                                    *Attorneys for Plaintiff*

                                    *\* Application to practice by association
                                    forthcoming*

45